# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00159-CV

---

**J. B., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 22DFAM333072, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant J.B. (Mother) appeals from the trial court's final decree terminating her parental rights to her three-year-old daughter, Emily.[1]  In three issues on appeal, Mother asserts that the evidence is legally and factually insufficient to support the trial court's finding that statutory grounds for termination exist and termination of her parental rights was in the child's best interest.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2).  For the following reasons, we affirm the trial court's termination decree.

---

[1] For the child's privacy, we will refer to her by an alias and her family members by their relationships to her.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## FACTUAL AND PROCEDURAL SUMMARY

Mother is the biological mother of Emily who was approximately three years old at the time of trial.[2] On July 18, 2022, based on concerns of drug use and endangerment to Emily, the Texas Department of Family and Protective Services (the Department) filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The trial court appointed the Department as Emily's temporary managing conservator the same day.

The trial occurred over two days in January and February 2024. The trial court heard testimony from five witnesses, including Department caseworkers Jasmine Applin and Misty von Bougie, court-appointed special advocate (CASA) volunteer and guardian ad litem for the child Denise Hanley, Mother, and psychiatrist Dr. Solomon Williams, M.D. The exhibits admitted at trial included the removal affidavit; Mother's court-ordered service plan; Mother's drug testing results; Mother's psychological evaluation; and Mother's psychiatric evaluation.

Testimony began with Applin, who was the current Department caseworker at the time of trial. She stated that she was assigned the case in November 2023, taking over from former caseworker von Bougie. Applin testified that the Department became involved in the case after learning of an incident when Mother was driving up and down the road at a high rate of speed while experiencing suicidal ideations. According to the removal affidavit and other evidence at trial,[3] City of Troy police officers responded to a residence where Mother was living

---

[2] Mother testified that Emily's biological father died by suicide before Emily was born.

[3] Mother appears to argue on appeal that the testimony about the affidavit was "hearsay within hearsay" because the officers were not called to testify and that this cannot constitute clear and convincing evidence required for termination. We note that Mother did not object to the admission of the affidavit at the trial court, and thus to the extent Mother raises this as an

at the time with her boyfriend and her boyfriend's mother. It was reported that Mother was making threats to harm herself and there were concerns that she may have been incapacitated and in need of medical attention. Mother eventually returned to the residence and pulled into the driveway, where she was followed by a police officer. According to the affidavit, Mother ran into the residence and refused to come back out when the officers requested her to do so. Based on concerns that one-year-old Emily was inside the home, the officers entered the unlocked front door and announced their appearance. Once inside, the officers located Emily but could not find Mother. The officers made several announcements for Mother to come out but she did not appear. It was later discovered that Mother ran out of the side gate door and left Emily alone in the home. Emily had been left in the home alone for an unknown length of time.[4] The police eventually found Mother, who was covered in dirt and mud, and arrested her and placed her in Bell County Jail.

As a result, Emily was removed from Mother's custody and the Department was named Emily's temporary managing conservator. After the initial adversary hearing on July 28, 2022, the Department performed a Family Strengths and Needs Assessment (FSNA) to gather information to create the personalized family plan of service for Mother. The trial court entered the requirements of the family service plan as orders of the court on September 13, 2022. These orders included the requirements, among others, that Mother submit to psychological and

---

issue in her brief, it is waived. *See* Tex. R. App. P. 33.1(a) (providing requirements to preserve error on appeal).

[4] When Mother testified, she stated that, contrary to the police report, she did not leave Emily at home alone. She stated that she left Emily with her boyfriend at the time, in whose home she and Emily were living.

psychiatric evaluations as soon as possible and that she refrain from using all illegal substances, including marijuana, for the pendency of the case.

*Service plan*

Applin testified about Mother's compliance with the court-ordered service plan. The trial court's orders required Mother to attend individual therapy, perform a drug and alcohol assessment (OSAR), attend parenting classes, take part in both a psychiatric and psychological evaluation, participate in supervised visits with Emily, abstain from illegal activity, abstain from using illegal drugs, and drug test twice a month. It also required Mother to maintain a safe and clean home, obtain her learner's permit and driver's license, and obtain her general education diploma (GED).

Mother participated in a psychological evaluation performed by Frances Gordon. The report confirmed that Mother had "sufficient intellectual ability to participate in the therapeutic process." As a result of the evaluation, it was recommended that Mother be provided with housing assistance, that she should comply with future drug screenings, and that she might benefit from parenting training and individual counseling. Mother's psychological evaluation stated she had reported a history of "over 100" instances of inpatient services for self-harm and suicide attempts, which Mother confirmed at trial. The report further stated that Mother "indicated she has a history of engaging in both non-suicidal self-injurious behaviors, suicidal ideation, and self-injurious behaviors with the intent of suicide." Despite this self-reported history, however, Applin testified that Mother denied having "any mental health issues."

Mother also participated in a psychiatric evaluation with Dr. Solomon Williams. The evaluation revealed that Mother showed symptoms consistent with "a pattern of instability

4

in mood, self-mutilating, suicidal behaviors, chronic irritability, impulsivity, [and] persistent depression." Dr. Williams recommended that Mother (1) undergo random drug testing for the duration of the case; (2) would benefit from an OSAR evaluation and possible initiation of Substance Abuse Disorder Intensive Outpatient Programming; (3) should participate in supportive therapy; (4) should participate in therapeutic treatment for her borderline personality disorder; (5) should engage in dialectical behavioral therapy (DBT) to mitigate preoccupation with suicide and self-mutilation; and (6) should begin a prescription mood stabilizer to manage her bipolar disorder symptoms. It was further recommended that the management of Mother's mental health symptoms would be best accomplished under the care of a psychiatrist. The recommendation indicated that, if Mother participated "in long-term therapy and a regimen of psychotropic medications over an extended period, her prognosis is fair to good."

Applin testified that Mother complied with some but not all requirements of the family service plan. Applin testified that Mother did not report any issues with understanding any part of the service plan. However, when Mother was asked on cross-examination why she did not have the number to call OSAR since it was on the family plan, Mother responded, "What family plan?" When counsel reminded her that it was part of the paperwork she signed on August 2022 at the family group conference, she stated, "I don't remember signing paperwork, but I'm sure I did."

*Beginning of the case*

Mother entered the foster care system in 2005 when she was one year old. She stated she was in and out of the foster system her whole life. Mother had reported that she began

using cannabis at thirteen years old. Mother stated that she has been in two domestic violence relationships in the past.

Applin testified that, when this case began, Mother was still a minor as she was seventeen years old. Applin explained that Mother had grown up in the Department's care. Applin testified that the Department, CASA, and the court all attempted to try to get Mother to agree to go back into state care so that she could "get some services." But because Mother chose not to stay in the Department's care when she aged out at age eighteen, Mother did not receive any housing assistance from the Department; rather, she paid for her living expenses through social security and her various jobs. When Mother testified, she explained that she chose not to go back into Department care to obtain benefits because at the time she believed it would separate her and Emily.

Throughout the case, Mother lived in several different residences. Shortly after the case began, Mother moved to a rural area near Alpine, Texas. After that, she moved to a south Texas town near the border where she had a job and lived with friends. Mother's boyfriend, E.S., lived in a neighboring town. Von Bougie—Mother's first caseworker—testified that she encouraged Mother to move back to central Texas so that it would be easier for her to work services and attend visitation with Emily. Mother agreed and moved to Round Rock, where she began visiting Emily approximately once a week.

Both caseworkers—Applin and von Bougie—testified that they had concerns with Mother's behavior toward them throughout the case. Applin testified that Mother would call her "constantly," and that if Mother was told something she did not like, she would "ignore it and just say that, 'It's okay, I'll just tell the judge.'" Applin also testified that, when she asked Mother if there could potentially be other fathers besides the ones the Department had looked

6

into, Mother first stated "no" but then indicated that she would lie and tell the judge that "there was another man out there" in an attempt to delay the case. Von Bougie echoed these concerns, testifying that Mother had "erratic" behavior, "entitlement issues," and would make threats and harass people when things did not go her way. Von Bougie described once instance where Mother was refused a supervised visitation with Emily because she did not confirm the visit 24 hours before; Mother threatened to go to the Department office and cause a scene, she threatened to go to Emily's daycare, and she threatened to go to Emily's foster home placement. Von Bougie stated that Mother also threatened to "blow up" von Bougie's phone and that Mother began calling her from three different phones. Von Bougie testified that Mother exhibited this same conduct with von Bougie's supervisor and with Denise Hanley, the CASA volunteer. When von Bougie spoke to Mother about how the Department found this behavior concerning, Mother swore at von Bougie and told her how "horrible [she was]." Mother also mentioned the trial judge's name in what von Bougie viewed as an attempt to "tell on her."

At the start of the case, Emily was placed in a foster home for a short period time and then moved to a placement with a family friend. According to the caseworkers, the placement broke down because Mother had been "very argumentative with the household," was not following directions, and left the home with Emily without permission. Applin testified about a time in late April 2023 when Mother visited the family friend's home for a supervised visitation with Emily. A disagreement occurred, resulting in Mother, Emily, and Mother's boyfriend E.S. being locked out of the house. The police were called, and Mother took Emily off the premises without the placement's permission and in direct violation of the court's orders. Applin testified that her supervisor had to go out that night to try and track them down. After that incident, the family no longer wanted to be involved in the case, and Emily returned to foster

7

care. When Mother testified at trial, she stated it was her understanding that she was allowed to take Emily with her.

Hanley was appointed as Emily's guardian ad litem in November 2022. Hanley testified about an incident in July 2023 when Mother claims she was inappropriately touched by a man—unknown to Mother—whom she had allowed into her residence. This incident concerned Hanley for Emily's safety. The record is unclear whether Emily was in the home when the incident occurred. Hanley stated that Mother tended to be very argumentative with others and tended to blame "the whole world and its army instead of reflecting on her own behaviors."

*Drug use*

Dr. Solomon Williams, M.D. testified on the second day of trial. He performed a psychiatric evaluation of Mother in August 2022, and he diagnosed her with cannabis use disorder, cyclothymic disorder (a form of bipolar disorder), and borderline personality disorder.

Dr. Williams explained that a cannabis use disorder is "use of marijuana in such a way that it interferes with [one's] psychosocial functioning, [one's] job, [and one's] role in society." According to Dr. Williams, Mother had reported that she began using cannabis at the age of thirteen and that, at the time of the evaluation, she had been using it approximately every other day. While Mother was not exhibiting psychosis at the time of her evaluation, Dr. Williams stated that the consistent use of cannabis could "exacerbate anxiety, exacerbate mood disorder, [and] exacerbate psychosis." Dr. Williams recommended that Mother discontinue her cannabis use entirely. He stated he would not recommend CBD[5] or any other

_____

[5] "CBD" is the acronym for cannabidiol, which is a chemical found in marijuana.

8

type of related product to treat cannabis use disorder, stating that he would suggest the symptoms be treated instead by FDA-approved medication and a treatment of reliable modalities.

Applin testified that Mother was ordered to drug test on a weekly basis but that she was inconsistent. She testified that Mother "has either tested positive or not tested at all." Applin stated that the last time Mother drug tested was a couple weeks before trial and that those results were positive for marijuana. In addition, on one occasion in June 2023, Mother tested positive for cocaine. Applin testified that the Department was concerned about Mother's use of marijuana and cocaine because it was in direct violation of a court order and because it was endangering Emily by hindering Mother's ability to adequately care for her. Von Bougie testified that Mother "was in denial" about her drug use.

When Mother testified, she admitted she was aware of the trial court's requirement that she test negative for all substances. She explained her positive test results by stating that she does not use marijuana, but that she uses a CBD pen. She stated that she has a recommendation from a psychiatrist and a medical marijuana card. However, Mother admitted on cross-examination that she did not have the card when she was testing positive for marijuana when the case started in July 2022. She stated that she did not alert the court of the medical marijuana card earlier because she did not know she "had to do that." When Mother brought the medical marijuana card to court on the second day of trial as instructed, she admitted that the card contained a disclaimer that it was "not a prescription." Mother testified that she has never done cocaine and that the positive result for cocaine was less than accurate because it was done via an oral swab versus a hair follicle test.

*Mental health issues*

In addition to cannabis use disorder, Dr. Williams testified that he also diagnosed Mother with cyclothymic disorder and borderline personality disorder. Regarding Mother's cyclothymic disorder, Dr. Williams stated that this type of disorder is characterized by a "compilation of symptoms," including depression, low-grade hyper manic symptoms including self-esteem inflation, sleep difficulties, rapid speech, racing thoughts, and occasional impulsive behaviors. He stated that this diagnosis is treated with prescription mood stabilizers, and that the use of cannabis or CBD could make the condition worse by exacerbating mood swings. He recommended that Mother treat this condition with lithium, as she had suggested it had been effective for her in the past. He stated that her symptoms would continue if left untreated. Finally, Dr. Williams testified that Mother's third diagnosis—borderline personality disorder—is often described as "instability in both [one's] sense of self, instability in [one's] interpersonal relationship[s], and instability in [one's] mood." People with borderline personality disorder "have tumultuous relationship[s] with significant others, friends, family and whoever they come in contact with," and they also have "a preoccupation in self-harm behavior." Dr. Williams stated that the standard treatment for this diagnosis is dialectical behavioral therapy (DBT). While Dr. Williams stated that DBT is the "gold standard" for treatment of Mother's borderline personality disorder, he agreed that non-DBT therapy could still be helpful for the person with borderline personality disorder as long as the person has "somebody to trust."

Applin testified that the Department was particularly concerned that, at the time of trial, Mother was not under the care of a psychiatrist, nor was she taking any medication to treat her bipolar disorder or her borderline personality disorder. Mother had not taken any medication for her mental health issues in the last three years; according to Applin, Mother had

10

stated that she "didn't need" the medications. When asked whether she believed Mother still possessed any of the behaviors identified in the psychiatrist's evaluation (instability in mood, self-mutilating, suicidal behaviors, chronic irritability, impulsivity, and persistent depression), Applin stated yes—impulsivity and irritability. At the time of trial, Mother was participating in weekly therapy sessions with therapist Brian Cobb. Applin testified that, while Mother was consistently attending her therapy appointments with Cobb for the past month and a half, she had previously gone through four different therapists. All previous therapists had unsuccessfully discharged Mother—at least one had discharged her for failing to attend regularly. Applin also testified that Mother did not complete her parenting classes, nor did she provide a reason to the Department as to why she had not completed them.

Mother refuted the testimony that she was not under the care of a psychiatrist at any time during this case. She stated she saw a psychiatrist, Helena Hernandez, who prescribed her lithium and Seroquel. Mother stated she stopped taking the prescribed medications because she "could not refill her prescription." She stated that the last time she had taken those medications was before she went to the south Texas border town. Mother also emphasized that she had not been hospitalized for mental health issues for the last three years. Mother stated that her caseworker never went over the recommendations made by the psychiatrist and psychologist at the beginning of the case. She also denied being given the suggestion that she should seek out the assistance of state-provided mental health services (MHMR). Applin admitted on cross-examination that, as far as she knew, neither she nor any prior caseworker ever specifically referred Mother to MHMR. Applin admitted that MHMR would have been the referral needed to help Mother retain a psychiatrist or have medication prescribed.

11

*Lack of positive change from Mother*

Hanley interacted with Mother and Emily throughout the case and testified that she had concerns about Emily going back to live with Mother. She believed that Mother was not addressing her mental health issues, she was constantly moving and "residing under someone else's roof," she had an inability to keep a safe and protective environment for Emily, and she continued to use drugs despite the court order. For those reasons, she believed termination of Mother's parental rights would be in Emily's best interest.

Hanley testified that Mother was in denial about having mental health issues. Hanley stated she did not think Mother had made positive behavioral changes since the start of the case. As the guardian ad litem for Emily, Hanley testified it was her role to look out for Emily's best interest. She stated that it is in Emily's best interest to live in a stable environment where she is grounded and given direction but at this point in time, Mother cannot provide that for her. Hanley testified that Mother had held numerous jobs during the pendency of the case, but she had not remained employed at any of them for any extended period of time. Applin echoed these concerns. She testified that, at the time of trial, Mother was living in Round Rock with two individuals—Mother's female friend, E.W., and E.S. Mother testified that her name is not on the lease. Mother had been living there for the last four to five months before trial. Applin testified that the Department was concerned about Mother living with E.W. because she has a criminal history, including a 2021 charge for an assault causing bodily injury. When Applin spoke to E.W. about the assault, E.W. stated that she did not believe it should have shown up on her record, and that she received twelve months' probation. Applin testified that she has visited the home and that, other than E.W.'s assault charge, she did not have any issues with the home. Applin testified that she did not feel as if this latest living arrangement demonstrated

12

stability, however, because Mother would frequently have issues between herself and the person she is living with, causing her to move often.

At the time of trial, Mother was attending supervised visits with Emily once a week. Throughout the case, Mother attended all visits with Emily except for two; one was cancelled because Mother did not confirm, and the other was canceled because Mother did not confirm within 24 hours. Applin stated she has observed Mother's visits with Emily and that they go well and that it appears Emily and Mother are bonded. Hanley echoed these sentiments, stating that when she observed the visits between Mother and Emily, the visits were appropriate and the two seemed bonded. Applin stated that she believes Mother loves Emily but believes that Mother is not stable enough to take care of her. She stated her belief that Mother has not learned any lessons or made any behavioral changes to warrant the return of her daughter. Both Applin and von Bougie testified that the Department had "tried everything" to get Emily reunified with Mother, but that Mother had not made the necessary behavioral changes to get Emily back because Mother did not complete all her services, Mother continued to use drugs, and Mother still felt as if she had done nothing wrong. Applin stated she did not believe it would be safe for Emily to go home to Mother because Emily "won't have stability" and because Mother's marijuana use makes it an unsafe environment for her.

Regarding her compliance with the family service plan, Mother stated she believed that she had done all the things that she was asked. She admitted to not doing the OSAR but believed that is the only thing she has not done on her service plan. At the time of trial, Mother had been working as a receptionist at a hair salon for approximately two months. Mother stated that, in addition to her job at the hair salon, she also watches dogs for extra income. She receives social security payments each month, and that combined with her other

13

income totals to approximately $2,000 per month. She stated that E.S. works and is able to provide for the household and that Emily knows him and calls him "Dad." Mother does not have a driver's license and cannot get one due to tickets, but she has a state identification card. She does not have a high school diploma or GED. She stated that she enrolled in Temple College for the GED program but did not complete the course. She explained that she started the parenting classes but did not finish them. Mother currently lives in the two-bedroom apartment with E.W. and E.S. where she pays rent. She has been trying to find a place of her own but because she does not have a credit history, she has been denied. Contrary to Hanley's testimony, Mother stated that no one at the Department or CASA helped her look for affordable, income-based housing options. However, at trial Mother continued to feel as if she did not "need the extra help." She stated, "I feel I can do it on my own."

Mother testified that she believes she has fixed all the concerns that the Department had at the beginning of the case and that she is ready to have Emily home and in her care. Mother testified that, if the court did not terminate her rights, she would be willing to work with the foster family with visits and would work on getting her GED and finding stable employment. After that, she planned to "come back and seek custody." Mother believes that she has made positive behavioral changes from the start of the case, including changes in her attitude, her willingness to go to counseling, and progress in keeping herself calm when things do not go her way.

*Foster family*

Emily had been living with her Foster Family since August 27, 2022. Applin testified that Foster Family has expressed their desire to adopt Emily. Emily calls her foster

14

parents (who are a same-sex couple) "mom" and "mommy." Applin stated that the couple has a son that Emily gets along with very well. She stated that Emily and the son "play together well" and "[Emily] looks to him for anything." Hanley stated that she has observed Emily with Foster Family many times and that she is very bonded with them. Applin and von Bougie both testified that they believed Foster Family would be able to facilitate anything Emily might need going forward. Hanley echoed this sentiment, stating that Emily's foster parents have provided Emily with stability and love and have provided for her medical and educational needs. She stated that Emily "is not wanting for anything."

On March 28, 2024, the trial court signed a Final Decree of Termination, finding by clear and convincing evidence that termination of Mother's parental rights was in Emily's best interest under section 161.001(b)(2) and warranted under subsections (D) (endangering environment), (E) (endangering conduct), and (O) (failure to follow court-ordered service plan) under section 161.001(b)(1) of the Family Code. Mother timely filed this appeal.

## DISCUSSION

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence at least one statutory ground for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at

15

630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630–31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed or conflicting evidence and consider whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. An appellate court must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

### *Statutory predicate grounds*

In her first issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under subsection (O). *See* Tex. Fam. Code § 161.001(b)(1)(O). However, we begin by analyzing Mother's third issue regarding the legal and factual sufficiency of the subsections (D) and (E) findings because of those findings' "significant consequences for future parental rights." *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Under subsection (D), a court may terminate parental rights to a child if the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D). Under subsection (E), termination may occur if the parent has engaged in conduct or knowingly placed that child with persons who engaged in conduct which endangers

16

the child's physical or emotional well-being. *See id.* § 161.001(b)(1)(E). Subsection (D) focuses on the child's physical environment, and the parent's conduct can be a factor in producing an environment that threatens the child's well-being. *See J.G v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). "A single act or omission can support termination under subsection (D), but termination under subsection (E) must be based on 'a voluntary, deliberate, and conscious course of conduct.'" *J.G.*, 592 S.W.3d at 524. A parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (stating that stability and permanence are paramount in upbringing of children).

In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). A parent's conduct that occurs before the person's children are born can be a relevant factor in establishing the endangering course of conduct required under subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that parent's history of "irresponsible choices" is probative evidence that parent has engaged in endangering conduct).

17

Evidence at trial showed that Mother has been unable to provide a stable environment for Emily. This case began when Mother left one-year-old Emily home alone while driving around erratically exhibiting suicidal ideations. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (providing that child is endangered when environment creates potential for danger that parent is aware of but consciously disregards). In addition, the trial court heard evidence that Mother continued to use drugs throughout the case. The Department and CASA witnesses all testified about their concerns with Mother testing positive for cocaine and Mother continuing to test positive for marijuana on her drug tests throughout the pendency of the case, despite the court order that she abstain from all illegal substances. *See In re L.M.R.*, No. 14-17-00597-CV, 2018 WL 285121, at *6 (Tex. App.—Houston [14th Dist.] Jan. 4, 2018, pet. denied) (mem. op.) ("Continued illegal drug use after a child's removal jeopardizes parental rights and may demonstrate an endangering course of conduct."). Dr. Williams diagnosed Mother with cannabis use disorder and recommended that she discontinue all marijuana use. Mother tried justifying her actions by explaining that she was not smoking or otherwise ingesting marijuana, but CBD. Dr. Williams, however, stated that the use of CBD does not treat cannabis use disorder and that CBD can exacerbate Mother's other diagnoses of cyclothymic disorder and borderline personality disorder. Mother also admitted at trial that she failed to complete the OSAR evaluation, but she claimed it was because she did not have the phone number to set it up, even though on cross-examination it was pointed out to her that the phone number was on the family service plan paperwork that she had signed.

The record also contains evidence related to Mother's mental health issues and her failure to participate in services related to treatment. While mental illness alone is not grounds for terminating the parent-child relationship, untreated mental illness can expose a child

to endangerment, and it is a factor that the court may consider in its analysis. *Maxwell v. Texas Dep't of Family & Protective Servs.*, No. 03–11–00242–CV, 2012 WL 987787, at *9–10 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.). Mother, only nineteen years old at the time of trial, self-reported "over 100" instances of inpatient hospitalizations due to mental health concerns over the course of her life. Dr. Williams testified that Mother's mental health issues should be treated with a course of mood stabilizers and dialectical behavioral therapy. While testimony was somewhat disputed regarding Mother's consistency in taking her medications throughout the course of the case, it was undisputed that, at the time of trial, she had not been taking them. Mother argues that, although the Department considered medication important, they offered her no help in gaining access to said medication. Mother stated that her caseworker never went over the recommendations made by the psychiatrist and psychologist at the beginning of the case. She also denied being given the suggestion that she should seek out the assistance of MHMR. Mother denied that either of the caseworkers told her how to go about making an appointment with MHMR.[6] Applin admitted on cross examination that, as far as she knew, neither she nor any prior caseworker ever referred Mother to MHMR. She admitted that MHMR would have been the referral needed to help Mother retain a psychiatrist or have medication prescribed.

The trial court could have considered Mother's history of hospitalizations prior to Emily's removal as creating an endangering environment for Emily and her present non-compliance with her medication schedule as endangering conduct. *See In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.)

---

[6] The periodic reports from the Department indicate that Mother "is currently prescribed medication through MHMR." The family service plan indicates that it was Mother's responsibility to reach out to MHMR for services.

19

(mem. op.) (considering parent's failure to take medication to treat mental health issues as factor in creating environment that endangers child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's mental health and noncompliance with her medication schedule as factors in endangering child); *In re P.H.*, 544 S.W.3d 850, 857-58 (Tex. App.—El Paso 2017, no pet.) (explaining that parent's untreated mental illness can expose child to endangerment because, when parent fails to take required medication, parent can behave erratically and neglect care of child).

Finally, the evidence showed that Mother had been unable to provide a life of stability for Emily and that she failed to accept responsibility for her role in doing so. Applin, von Bougie, and Hanley all testified that Mother had behavioral outbursts when things did not go her way and that this type of behavior did not improve over the course of the case. The only evidence of positive change in behavior came from Mother's testimony that she believes she has made positive behavioral changes from the start of the case, including changes in her attitude, her willingness to go to counseling, and progress in keeping herself calm when things do not go her way. The evidence showed that Mother's behavior was concerning to the Department caseworkers and CASA volunteer because it affected Mother's interpersonal relationships with others. As one example, the evidence showed that Mother had a history of frequently moving residences due to various reasons, one of them being Mother's inability to get along with roommates. Thus, the trial court could have found Mother's denial of her behavioral problems and lack of effort to change them during the pendency of the case to be endangering conduct. *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied) (providing that parent's efforts to improve or enhance parenting skills are relevant in determining whether parent's conduct results in endangerment under subsection (E)).

20

In response to the Department's evidence on endangerment, Mother points to the Department's evidence that all her supervised visits with Emily were safe and appropriate, that she had a somewhat stable job at the time of trial, and that she had a residence that was safe and suitable for Emily. Mother also emphasized at trial that she had not been hospitalized within the last three years and that she is consistently attending therapy. However, the trial court also heard evidence that these recent achievements were accomplished too late to have shown a successful pattern of stability. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (providing that father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"). The trial court heard the testimony of various witnesses and was entrusted with weighing their credibility, and we cannot second-guess those decisions. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (holding that appellate courts must defer to trial court's factual determinations, even in parental termination cases). Moreover, "a trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Based on the record and the deference we must pay to the factfinder's determinations related to credibility, the trial court could have found by clear and convincing evidence that Mother had endangered Emily, both by her course of conduct and by placing Emily in an environment that threatened her well-being.

Thus, we hold that the evidence is both legally and factually sufficient to support the trial court's findings of statutory grounds for termination under subsections (D) and (E). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.); *see also In re N.G.*, 577 S.W.3d at 237 n.1. Because we affirm the trial court's predicate ground findings of (D) and (E), we need not address the sufficiency of the evidence on

predicate ground (O). *See In re N.G.*, 577 S.W.3d at 232; Tex. R. App. P. 47.1. We overrule Mother's third issue.

### Best Interest Finding

In her second issue, Mother challenges the legal and factual sufficiency of the trial court's findings that termination was in Emily's best interest.

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the child, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.— Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.— Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination

and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1. Although a strong presumption exists that a child's best interest is served by keeping the child with his or her biological parents, that presumption disappears when confronted with evidence to the contrary. *See In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

The evidence at trial showed that Mother has a history of mental health concerns that significantly affect her decision-making and that Mother failed to take significant steps to address these concerns. At the time of trial Mother was continuing to self-medicate with CBD, thus testing positive on the court-ordered drug tests, instead of taking the recommended medication for her diagnosed mental health issues. At the beginning of the case and at trial, Mother continued to assert her belief that she did not need the medications. The trial court could have found that this evidence tended to show that Mother would not be likely to change her behavior in the future. *See In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (parent's failure to show that she was stable enough to parent her child "for any prolonged period" entitled factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption").

The trial court heard evidence contrary to its ultimate finding that termination of Mother's parental rights was in Emily's best interest, including evidence that Mother loved Emily, that Mother's supervised visits with Emily were safe and appropriate, and that Mother attended almost all of them, and that Mother was attending at least some therapy for her mental

health issues. However, the record also shows that several witnesses, including Hanley, the child's guardian ad litem, testified that it would be in Emily's best interest for Mother's parental rights to be terminated. These witnesses observed Mother's behavior throughout the case and each attempted to work with her to help Mother bring Emily back home. Both caseworkers testified that they did everything they could to help Mother regain custody of Emily. However, because Mother did not successfully complete what the Department required of her, the caseworkers felt Mother could not provide a safe and stable environment for Emily and that Mother's parental rights should be terminated. These witnesses also observed Emily with Foster Family many times, and all believed it was in Emily's best interest for Foster Family to adopt her. *See In re A.B.*, 437 S.W.3d at 503 (providing that appellate court must afford due deference to factfinder, who, having full opportunity to observe witness testimony first-hand, is sole arbiter when assessing credibility and demeanor of witnesses).

Finally, the trial court heard evidence that Emily had been living with Foster Family for the last two years (almost the entirety of Emily's life); that Emily was bonded to Foster Family; and that Foster Family was able to provide her a safe, stable, and loving home. While Emily was too young to indicate her wishes, Hanley observed Emily with Foster Family many times and testified that Emily is bonded with Foster Family, including their young son. Hanley recommended that Mother's parental rights be terminated so that Foster Family may adopt Emily. *See L.R.*, 2018 WL 3059959, at *1 ("[F]actfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered") (quoting *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.))).

24

Considering the totality of the evidence in light of the *Holley* factors, and giving proper deference to the trial court's determinations of witness credibility and the weight to be given to the evidence, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination is in the child's best interest. *See In re A.C.*, 560 S.W.3d at 630–31. Accordingly, we overrule Mother's second issue.

## CONCLUSION

Having overruled Mother's challenges to the evidence supporting the trial court's finding of best interest and of the statutory grounds for termination under subsections (D) and (E), we affirm the trial court's decree terminating Mother's parental rights to Emily.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   August 23, 2024

25